Upon the other grounds stated the writ is refused, with costs.

---

STATE, JOHN G. WHITALL, PROSECUTOR, v. THE BOARD OF CHOSEN FREEHOLDERS OF GLOUCESTER COUNTY.

1. The boards of chosen freeholders have the authority to construct bridges within the limits of a city.
2. The structure which the board, in their discretion, can build, need not span a watercourse.
3. If it is such as cannot be built by ordinary laborers, but needs craftsmen and mechanics to construct, then the board can execute the work.

---

The prosecutors are tax payers, residing in the county of Gloucester, outside of the city of Woodbury.

They bring up by this writ a resolution of the board of chosen freeholders of Gloucester county, passed May 24th,

1877, as follows: "That the freeholders from Woodbury be authorized to build a bridge on Hunter street, in Woodbury." Woodbury is an incorporated city in Gloucester county.

Hunter street is laid out across a cut made by the West Jersey Railroad Company, within the limits of Woodbury, and has been laid out since said cut was made.

The proposed bridge is to cross the said cut.

Argued at February Term, 1878, before Justices VAN SYCKEL, DIXON and REED.

For the prosecutors, *D. J. Pancoast.*

For the defendants, *James Moore* and *P. L. Voorhees.*

The opinion of the court was delivered by

REED, J. The prosecutors are tax payers in the county of Gloucester. As such, they desire to have a review of the resolution of the board of chosen freeholders of that county, proposing and directing an act which involves the expenditure of county moneys. For that purpose they have exercised their privilege as tax payers, and brought this resolution into this court by *certiorari* for review. *State, Bradley, pros.,* v. *Hammonton,* 9 *Vroom* 430 ; *State, Lewis, pros.,* v. *Freeholders of Hudson Co.,* 8 *Vroom* 254.

The prosecutors urge that there is a want of power in the board to do this work. They place the absence of such power upon two grounds—First. Because the proposed structure is within the limits of an incorporated city ; and, Second. Because it is not such a structure as is within the meaning of the word "bridge," as used in the respective acts relative to bridges and the boards of chosen freeholders. As to the first point, it is apparent that unless the power to erect bridges in the cities exists in the board of chosen freeholders, a gross injustice is put upon their inhabitants who pay county taxes.

A large portion of the sum raised for county purposes by taxation upon every citizen within or without the limits of incorporated cities, is often for this very purpose. A denial

of the power of the board to build bridges within the limits of cities, will compel their inhabitants, after contributing for this very object, to again contribute as members of the municipality to do this work.

No such construction of the powers of the board has ever been heretofore urged, so far as I know. Most certainly, if it had been successfully urged, it would have been remedied by legislative action.

These acts have existed for three quarters of a century. During that entire time, cities have existed and bridges been repeatedly built within them by boards of chosen freeholders.

The technical difficulty urged, resulting from the employment of the word "township" only in the act concerning bridges, is not insurmountable. This act is, in some respects, ancillary to that concerning the board of chosen freeholders. The latter act gives the board the authority to raise money to (among other things) construct and repair bridges. The bridge act deals entirely with the manner of exercising one of the functions of the board, and the provisions of the two acts are in this respect *in pari materia*.

Now the freeholders' act provides, section thirty-seven, that the term "township" shall be understood to comprehend precinct and ward. Applying the scope of this direction, as to construction, to all cases where this power to build bridges given under the acts is to be exercised, it relieves the question of all difficulty.

Even without the aid of this section, I would be unwilling to say that the proposed expenditure, made within the discretion of the board, and presumed to be necessary, should be defeated by a technical objection which does not attack the equity of proposed action. Courts will not always interfere to interdict an act which they would not have enforced. *State, Lewis, pros.*, v. *Freeholders of Hudson, supra.*

I do not think, upon this ground, the resolution should be vacated.

The second point is, that the term "bridge," as used in the two acts concerning bridges and chosen freeholders, has a

technical meaning, which does not include a structure like the one proposed to be erected by this resolution. The contention is that the legislature meant to impose upon the board of chosen freeholders the duty of constructing and repairing such bridges as the inhabitants of the county, at common law, were bound to repair. It was well settled that a bridge, repairable at common law by the county, should cross a stream or water course. It should be a structure *super flumen vel cursum aquæ.*

This technical meaning of the term "bridge," if it exists, must be derived from the unexpressed intention of the legislature. And that intention must be drawn from the one fact that the burden of supporting highways and maintaining bridges here, as in England, is placed upon different political bodies.

In this country, generally, bridges and highways have not been treated as distinct and separate subjects of legislative provision.

Bridges are considered to be portions of the highways which pass over them, and their maintenance is confided to the same corporate bodies or public officers upon whom the duty rests of maintaining the highways.

The bridges thus repairable are not alone those which span a water course. Unless the import of the term is limited by statute, it means any structure by which a highway is carried over a place.

A bridge has, therefore, been defined to be a building constructed over a river, creek or other stream, or over a ditch or other place, in order to facilitate the passage over the same. *Shear. & Red. on Neg.,* § 248.

This definition covers the structure across this cut, unless the signification is restricted by the fact that the duty of repairing highways and bridges is separated.

In regard to the legislative intent in placing the duty of constructing bridges upon the counties, which was first partially effected by the act of 1760, two facts appear:

*First.* That while the duty in England was upon the in-

habitants to maintain, and they were indictable for a failure to perform, in this state the duty was placed, not upon the inhabitants, but upon the board of chosen freeholders.

*Second.* While the duty in England was only to repair, the obligation, by our act, is to construct and re-build as well as repair.

These differences are important in determining how far the idea of assimilating the duties of repairing highways and bridges in this state to the English system was in the mind of the legislature. They would seem to stand opposed to the idea that the English idea of a bridge was imported into our act with the use of the word in this connection.

Again, the history of the legislation in this state stands opposed to this position.

The common law rule as to the duty of repairing highways and bridges was never adopted in this state. *State* v. *Hudson Co.*, 1 *Vroom* 137.

Up to 1760, the obligation to maintain both was in the same political body. In that year, an act was passed, (2 *Nev.* 356,) which provided that as there are many bridges * * which cannot be sufficiently repaired by day labor without the assistance of particular handicraftsmen, be it enacted that where there are any bridges, in any of the towns in the counties of Burlington, &c., which cannot well be repaired by day laborers, that the overseer shall contract with tradesmen and have them built, and collect the money from the towns.

Here it is perceived that the same officer who maintains the highway builds the bridge, and the expense of both was paid by the township.

By the rule already alluded to, these bridges would not be limited to structures spanning water courses.

By the same act, in other counties, it was provided that all bridges requiring handicraft work, should be built, re-built, repaired and amended at the sole charge and expense of the whole county.

It is obvious that in both cases the class of bridges were

identical, namely, bridges which required skilled labor to construct.

As in the first instance it is apparent the term had its popular signification, I think it follows that we are not justified in giving a different signification to its use in the second instance.

Subsequently came the revolution, and afterwards, in 1794, our present act concerning freeholders, and in 1798, our act concerning bridges.

I think that the erection which, under these acts, the freeholders can construct, within their discretion, is that which, in the act of 1760, the overseer was authorized to contract for in some counties, and in others the freeholders were authorized to build.

Whenever the structure is such that the ordinary laborer, called upon the road by the overseer, is incompetent to construct, then the freeholders can employ craftsmen and mechanics to execute the work.

This view receives strong corroboration from section thirty eight of the present road act, (*Rev.*, p. 1003,) which provides " that it shall be the duty of the overseers to hire laborers, * * and to erect such bridges as can be built by common laborers."

The duty of the overseer in this respect goes no further. If, then, we should limit the authority of the county to the construction of a bridge spanning a water course, there will exist a class of bridges like the one proposed in this resolution, for the construction of which there is no provision. I do not think the contention for such a rule can be supported, and it follows that the structure proposed by the resolution is within the power of the board to erect.

This conclusion is in accordance with that reached by the Vice-Chancellor, in *McKinley* v. *Chosen Freeholders of Union County,* 2 *Stew.* 164.

The proceeding of the board is affirmed, with costs.